UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:

FELIX CANDELARIA JR. and
SARAH CANDELARIA,

    Debtors.                                                                                                      Case No.18-13232 t7

ILENE J. LASHINSKY,
United States Trustee,

    Plaintiff,

v.                                                                                                                    Adv. No. 19-01061-t

FELIX CANDELARIA JR. and
SARAH CANDELARIA,

    Defendants.

## **OPINION**

Before the Court is the United States Trustee's (UST's) complaint seeking denial of Debtors' discharge under 11 U.S.C. §§ 727(a)(2) and (a)(4). After a trial of the merits, the Court concludes that Debtor's discharge should be denied.

A.     <u>Facts</u>.[1]

    The Court finds:

---

[1] The Court takes judicial notice of its docket in this adversary proceeding; the main bankruptcy case; *In re Safe Site Child Development, Inc.*, case no. 19-10282-t11; and *In re Safe Site Youth Development, Inc.*, case no. 21-11399. *See St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979) (a court may sua sponte take judicial notice of its docket). The Court also takes judicial notice of the dockets in two state court proceedings, for the limited purpose of determining the dates complaints were filed against Debtors: *VNB Assets Corporation v. Felix J. Candelaria, Jr. et. al.*, no. D-1314-CV-2017-00560 (Second Judicial); and *Marchant, et al. v. Felix and Sarah Candelaria*, no. D-1314-cv-2017-01441 (Second Judicial).

Debtors have been in the child care business for more than twenty years. What started as an in-home child care sideline grew over time into a lucrative, five-star accredited[2] business in Los Lunas, New Mexico, accommodating about 250 children. The business is operated by Safe Site Child Development, Inc., a New Mexico nonprofit corporation.[3] Safe Site has no equity interest holders. Debtors are the only directors of Safe Site, control it, and are highly compensated employees. In 2019, Safe Site's monthly revenue was about $170,000, more than 90% of which came from CYFD.

Prepetition, Debtors and Safe Site apparently were good at providing child care, obtaining and maintaining contracts with CYFD, and satisfying the state's licensure and accreditation requirements. In contrast, Debtors, who had an insatiable thirst for cash, were unwilling or unable to keep accurate books of account for Safe Site, preferred not to pay payroll or personal income taxes, and did not operate Safe Site in a business-like manner. Thus, between 2015 and 2018, while Safe Site apparently provided adequate care for the children entrusted to it, Debtors steered Safe Site toward financial disaster.[4]

Safe Site's bookkeeper for 2015-2017, Judith Seligman, was involved in Safe Site's financial difficulties. Debtors attributed most of their poor business and financial decisions to Ms. Seligman. Debtors testified that they considered Ms. Seligman a "mentor" and followed her advice and instruction in all business matters. At trial, Debtors repeatedly blamed Ms. Seligman for the questionable actions they took.

---

[2] This is the highest level of State of New Mexico's Children, Youth & Families Department's ("CYFD's") accreditation for childcare facilities.
[3] Debtor's prior business, before 2009, was Con Carino Christian Development Center, a New Mexico for-profit corporation.
[4] Safe Site filed a chapter 11 case on February 9, 2019, but voluntarily dismissed the case on February 14, 2020. Its bankruptcy schedules reflected substantial balance sheet insolvency. Safe Site filed a new chapter 11 case on December 30, 2021. To date, no schedules have been filed.

In May 2008 Ms. Seligman, then a real estate agent, helped Debtors buy a commercial building, 1716 Los Lentes, in Los Lunas, New Mexico, for Safe Site's use. Debtors borrowed $807,000 from Valley National Bank[5] ("VNB") to pay for the property, secured by a first mortgage on the property. Debtors rented the Los Lentes property to Safe Site for an amount sufficient to cover the monthly mortgage payment ($5,756.86) and the other costs of ownership.

Debtors formed F&S Candelaria, LLC, a New Mexico limited liability company, in October 2009. They were the sole members. Debtors' apparent intent was to convey the Los Lentes property to F&S, which would then function as a real estate holding company. Debtors may also have intended for F&S Candelaria to own some of the vehicles used by Safe Site in its child care business. Whatever the intent, F&S Candelaria never ended up owning any real or personal property.

Debtors eventually defaulted on the VNB debt. On September 15, 2014, Debtors and VNB signed a one-year forbearance agreement. As part of the forbearance, VNB convinced Safe Site to guarantee the VNB debt.

In early 2015 Safe Site hired Ms. Seligman, who was not an accountant, to provide bookkeeping, banking, and real estate services. She was also responsible for paying Safe Site's state and federal payroll taxes and preparing tax returns. The terms of her employment are hotly disputed.

Safe Site moved out of the Los Lentes property in late 2015, into a larger, leased facility (the "Taylor Road" property). Base rent was $4,500 per month. Safe Site moved out of the Taylor Road property about a year later, into an even larger leased facility. The new lease, with Los Lunas Riverfront LLC, required monthly lease payments of about $32,000, with rent increases over time.

---

[5] Later, "VNB Assets."

Debtors did not pay the VNB loan at the end of the forbearance agreement. VNB filed a foreclosure action on the Los Lentes property in May 2017, naming, inter alia, Debtors and Safe Site as defendants. F&S Candelaria was not a named defendant.

In November 2017 the owner of the Taylor Road property sued Debtors for $423,700. Debtors answered and filed a counterclaim. The litigation was stayed by Debtors' bankruptcy filing. The owner did not file a proof of claim in the case.

In 2017 Mrs. Candelaria's salary was $228,000. That year Safe Site began paying her "management fees" in addition to her salary. In total, Safe Site paid $105,000 in management fees to Mrs. Candelaria in 2017. Mrs. Candelaria testified that she deposited the fee checks in an F&S Candelaria bank account and used the money to pay Safe Site's bills. As F&S Candelaria had no assets, employees, or operations, it made no sense to involve it in paying Safe Site's bills, let alone through the circuitous route described by Mrs. Candelaria. What actually happened to the money is not in the record, but Debtors' CPA, Leigh Van Gilst, testified that the $105,000 in management fees should have been treated as Mrs. Candelaria's income for tax purposes. The Court concludes that the "management fees" were a way for Debtors to siphon cash from Safe Site without treating it as salary or accounting for the funds.

The last management fee check, for $15,000, was dated September 6, 2017. In October 2017 Safe Site began paying Mr. Candelaria a salary that netted him $1,624.62 a week. Mr. Candelaria received $20,985.45 in net salary through the end of 2017.

In addition to their salaries, in 2017 Debtors withdrew $556,903.80 in cash from Safe Site's operating account (this figure includes the $105,000 of management fees). In 2018 Debtors withdrew $93,203.52 in cash in additional to their salaries. The withdrawals were in the form of cashier's checks, regular checks, and cash. Debtors testified that they used the cash to buy Safe

Site's food and supplies and to pay its expenses. That is true in part. For example, it appears that in several instances Mr. Candelaria obtained cashier's checks to pay Safe Site's rent to Los Lunas Riverfront.

Some of the cash withdrawal slips noted a purpose for the withdrawal. For example, on April 5, 2017, Mr. Candelaria withdrew $13,000 in cash, noting on the withdrawal slip that $7,000 was for a loan payment and $6,000 was for food. On May 5, 2017, Mrs. Candelaria withdrew $10,000 for "food and supplies," while Mr. Candelaria withdrew $32,806.59, apparently for rent. On May 11, 2017, Mr. Candelaria withdrew a total of $16,361.91, noting that $4,000 was for "loan payment" without indicating what the remainder was for. Nevertheless, there was no accounting for hundreds of thousands of dollars of cash Debtor withdrew from Safe Site in 2017 and 2018.

In late 2017, CYFD required an "outside" audit of Safe Site's books. Debtors retained Ms. Van Gilst to do the audit. She immediately discovered glaring problems with Safe Site's books and records, including Safe Site's failure to pay payroll taxes after June 30, 2015, and all of the unsubstantiated cash withdrawals.[6]

In January 2018 Safe Site fired Ms. Seligman and reported her to CYFD and law enforcement. Debtors asserted and continue to assert that Ms. Seligman embezzled large amounts of money from Safe Site and took other improper actions.[7]

---

[6] The accumulated unpaid payroll taxes were nearly $600,000, half of which would be a personal liability of Debtors. The IRS filed a proof of claim for $268,995.29 in this case.

[7] Ms. Seligman, on the other hand, asserts that all the money she took from Safe Site was authorized by Debtors. On January 10, 2018, Ms. Seligman sent a "whistleblower" letter to CYFD alleging that Debtors took many improper actions with Safe Site's funds. Ms. Seligman did not testify at the trial and is not a target of the UST's allegations. The only relevance of Ms. Seligman's conduct is whether Debtors took certain actions in reliance on her advice.

Ms. Van Gilst worked with Debtors to reconstruct Safe Site's books for 2016 and 2017. She also took over Safe Site's payroll function and prepared Debtors' personal income tax returns for 2017 and 2018.

Ms. Van Gilst asked Debtors to account for the cash they took out of Safe Site. When Debtors were able to provide backup showing that the cash was spent for Safe Site, Ms. Van Gilst added the expenses to the appropriate account. If Debtors were not able to provide documentation, Ms. Van Gilst categorized the withdrawal in Quick Books as "unknown." For 2017, $100,679.38 was categorized as "unknown," while in 2018 the figure was $23,713.78. The Court concludes that most or all of the "unknown" amounts of cash were taken out of Safe Site for the benefit of the Candelarias.

In addition, in 2017 Ms. Van Gilst included two accounts in the "other expenses" category, one labeled "0538-Candelaria Personal (MB)" - $29,589.04, and the other labeled "9742-Candelaria Checking (MB)" - $95,084.96. These accounts bring the 2017 total of unaccounted for, non-salary cash that benefited Debtors to $225,353.80.

When asked at trial what she did with extra cash that was not used to buy food and supplies, Mrs. Candelaria testified that she did not know. Mr. Candelaria, similarly, was at a loss to explain what became of much of the cash Debtors withdrew from Safe Site. The Court finds that Debtors kept unknown but large amounts of cash as unreported income.

During 2017 Debtors accumulated about $80,000 in cash at home, which they kept in a locked closet. Debtors testified that in late 2016 Mrs. Candelaria began cashing her paychecks and taking the cash home.[8] Although Debtors testified that Mrs. Candelaria's cashed paychecks were

---

[8] Mrs. Candelaria testified that she cashed her paychecks and took the money home because she was afraid Ms. Seligman might otherwise do something with it. The Court does not find this testimony credible.

the only source of the $80,000 in "closet cash," that that testimony is not credible. In 2017 Mr. Candelaria did not earn much. Given Debtors' claimed monthly expenses of more than $20,000 (later reduced to about $13,000, a more credible figure), all of Mrs. Candelaria's take-home pay (about $9,500 a month) would have gone to pay bills, with nothing left over for closet cash. Rather, the Court concludes that Debtors accumulated the $80,000 of closet cash by combining Mrs. Candelaria's cashed paychecks with the other cash taken out of Safe Site in 2017, including some portion of the $105,000 in management fees.

On December 22, 2017, Debtors used $62,000 of the closet cash to buy a 2017 Ram 2500 diesel pickup truck. The truck was titled in Debtors' names. Felix has driven the truck as his personal vehicle ever since.

At the end of December 2017, Debtors received "bonuses" of $10,000 each from Safe Site. Using their bonus money and some of their closet cash, Debtors made a $29,531.08 payment on a real estate contract for a house at 5 Leibel Court, Los Lunas, NM. The purchase price for the house was $479,531.08. Debtors signed the real estate contract on December 28, 2017.

Between August and October 8, 2018, Debtors transferred title of four of their vehicles to their daughters:

| Date of Transfer | Vehicle | Transferee |
|---|---|---|
| August 2018 | 2012 Nissan Sentra SL | Miranda Candelaria |
| September 28, 2018 | 2017 Ram 2500 | Marissa Candelaria |
| September 28, 2018 | 2011 Jeep Wrangler | Marissa Candelaria |
| October 8, 2018 | 2000 Jaguar S Type | Marissa Candelaria |

The value of the transferred vehicles was about $50,000-$60,000 at the time. No consideration was given. Debtors testified that they transferred the Ram 2500 to Marissa because

it was used at Safe Site and they hoped to retire and turn Safe Site over to Marissa.[9] Despite the title transfer, however, Mr. Candelaria retained possession, control, and use of the truck. To date, Debtors have taken no steps toward retirement, nor has Marissa taken over Safe Site's operations. When Safe Site filed its second chapter 11 case on December 30, 2021, Debtors were still the sole directors.

As to the remaining vehicles, Debtors testified that they were graduation gifts to their daughters. At the time of the transfers, however, eight years had passed since Marissa's graduation and five since Miranda's.

On December 31, 2018, Debtors filed this chapter 7 case, disclosing assets of $1,042,663 and liabilities of $2,517,283. They claimed all of their unencumbered property as exempt. Debtors' initial bankruptcy schedules omitted the following property or claims or had the following errors:

- 2017 Utility trailer (schedule A/B);
- Hearing aids valued at $5,000 (schedule A/B);
- 2007 Chrysler Town & Country minivan (schedule A/B)
- Life insurance policy with Primerica Life (schedule A/B);
- Johnson & Johnson common stock (schedule A/B);
- F&S Candelaria (schedule A/B);
- Two New Mexico Bank & Trust bank accounts (schedule A/B);
- IRS priority claim for unpaid payroll taxes (schedule E/F);
- Mr. Candelaria's social security income (schedule I);
- $2,860 per month in understated income (schedule I); and
- $6,855 per month in overstated expenses (schedule J).

Debtor's initial Statement of Financial Affairs (SoFA) had the following omissions or inaccuracies:

- Mr. Candelaria's $29,000 Safe Site income in 2017 (question 4);
- Mrs. Candelaria's 2017 income is understated by at least $105,000 (question 4);
- Undisclosed interest income in 2016 and 2017 (question 4);
- The pre-petition transfers of the four vehicles to daughters (questions 13 and 15);
- 2007 Ford Econoline van (question 23); and

---

[9] Debtors also own a 2017 utility trailer, which they hitch to the Ram when Safe Site participates in a parade, but they did not transfer the utility trailer to Marissa.

-8-
Case 19-01061-t    Doc 69    Filed 01/07/22    Entered 01/07/22 15:54:19 Page 8 of 20

- F&S Candelaria (question 27).

On January 17, 2019, Debtors amended their schedules to add the hearing aids, valued at $5,000.

On February 9, 2019, Safe Site filed a chapter 11 bankruptcy case. Safe Site's schedules disclosed petition date assets of $76,550 and liabilities of $1,472,052.91. Debtors effectively exsanguinated Safe Site.

On February 11, 2019, the case trustee in Debtors' chapter 7 case convened the § 341 meeting. When asked by her whether their schedules and SoFA were true and correct, Debtors testified that they were. When asked by a creditor's attorney whether they owned any "boats, trailers, motorcycles, anything like that," Debtors answered "no."[10]

Because the chapter 7 trustee had not received certain bank statements and other documents, she continued the § 341 meeting to May 8, 2019.

In late March 2019, the chapter 7 trustee asked Debtors' attorney about vehicles that Debtors had failed to disclose on their bankruptcy schedules. Debtors' attorney sent an email to the chapter 7 trustee confirming that he had "asked the company CPA about the possibility of missing vehicles."

On April 17, 2019, Debtors filed an amended schedule E/F, adding three creditors. On April 23, 2019, Debtors filed an amended schedule A/B, disclosing ownership of the 2017 utility trailer, valued at $1,500. They also filed an amended SoFA disclosing the four vehicle transfers to their daughters. They valued the 2017 Ram 2500 at $35,000 on the date of the transfer, although

---

[10] Months later, after Debtors had amended their bankruptcy schedules to include the 2017 utility trailer, Mr. Candelaria was asked at a deposition why Debtors denied owning a trailer when Mr. Holmes had asked about any. His response was that he did not consider the utility trailer his; rather, "[i]t was Safe Site's trailer." But Safe Site's bankruptcy schedules, filed only two days before Debtors' § 341 meeting, did not include the trailer.

they had paid $27,000 more than that nine months before. They valued the Nissan Sentra at $2,500 even though their daughter had sold it for $6,000 shortly after the transfer.

The continued § 341 meeting was held on May 8, 2019. At this meeting, Debtors disclosed ownership of a 2007 Town and Country minivan for the first time. Debtors testified that they never took money out of Safe Site for personal use and never paid personal expenses with Safe Site's money. That testimony was false. Debtors testified that they paid $55,000 for the 2017 Ram 2500. In fact, they had paid $62,000. Debtors also testified that the down payment on the Leibel Ct. house was "10 or 15 thousand dollars." The actual down payment was $29,531.08. Further, although they had not listed their interest in F&S Candelaria on their schedules or amendments, counsel for the UST asked Debtors about F&S Candelaria. Debtors testified that the Los Lentes property was held by F&S Candelaria and leased to Safe Site, which was not true. Mr. Candelaria testified that he could not remember whether F&S Candelaria had ever had a bank account, even though Debtors allegedly deposited $105,000 in management fees into an F&S Candelaria account.

On May 24, 2019, Debtors filed another amendment to schedule A/B, disclosing ownership of a 2001 Dodge Ram 1500 van, deleting a 2000 Dodge Ram wagon "previously listed in error," and disclosing ownership of the 2007 Chrysler Town & Country minivan they had mentioned at the continued § 341 meeting.

On August 1, 2019, the UST filed this adversary proceeding, seeking a denial of Debtors' discharge. The complaint stated claims for relief under §§ 727(a)(2)(A) and (a)(4)(A).[11]

On September 12, 2019, Debtors amended their bankruptcy schedules for the last time. Among other things, Debtors disclosed checking and savings accounts at New Mexico Bank &

---

[11] All statutory references are to 11 U.S.C.

Trust and Johnson & Johnson common stock valued at $1,000. They increased their monthly income by about $2,600 and decreased their monthly expenses by more than $6,800. As with their previous schedules, they claimed exemptions for all of their unencumbered assets.

Debtors also amended their SoFA on September 12, 2019. In the amended SoFA Debtors disclosed their interest in F&S Candelaria for the first time. This interest should also have been listed on Schedule A/B, but it was not. They disclosed interest income in 2016 and 2017 and Mr. Candelaria's Safe Site $29,000 in income in 2017. For unknown reasons, Debtors deleted their disclosure of the four vehicle transfers to their children. Instead, they disclosed that they had transferred the beneficial interest in the 2017 Ram 2500 truck to Safe Site, retaining only legal title ownership.[12] No mention is made of the other three vehicles.

The case trustee recovered $30,000 for the transferred vehicles. She was able to pay about $20,000 to priority tax claimants. General unsecured creditors did not receive a dividend.

At the October 2021 trial, Debtors testified at length. Neither was credible. For example, they testified that they transferred the Jeep Wrangler, Nissan Sentra, and Jaguar S Type to their daughters as graduation presents, five or eight years after the fact. That testimony is not credible. Debtors also testified that they transferred their expensive, nearly new Ram 2500 diesel pickup truck to their daughter as part of a business succession plan. That testimony is not credible. Third, they testified that all the cash they took out of Safe Site in 2017 and 2018 was used to pay business expenses. That is not credible. They testified that F&S Candelaria owned the Los Lentes property and some vehicles. It did not. They testified that everything they did between 2015-2018 was because Ms. Seligman told them to. That is not credible. They testified that Mrs. Candelaria cashed all of her paychecks and locked the money in a closet because they wanted to keep it out of Ms.

---

[12] Nothing in the record supports this assertion. It seems very unlikely that Debtors would make a $62,000 equity contribution to a nonprofit corporation, especially given the other facts of the case.

Seligman's reach. That is not credible; Ms. Seligman did not have access to Mrs. Candelaria's personal account, and the testimony is inconsistent with Debtors' repeated assertions that they relied on Ms. Seligman and did whatever she told them to do. These obvious untruths tainted the credibility of Debtors' other testimony, making it difficult to believe anything they said.

B.     <u>The Law Governing the Denial of Discharge</u>.

"Ordinarily, a debtor who requests a bankruptcy discharge will be granted one. However, . . . to be entitled to discharge, the debtor must deal fairly with creditors and with the court. This obligation is imposed indirectly through a series of objections to discharge set out in Code § 727(a)." *In re Gordon*, 526 B.R. 376, 387-88 (10th Cir. BAP 2015). In relevant part, § 727 provides:

> (a) The court shall grant the debtor a discharge, unless—
> . . . .
>    (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—
>       (A) property of the debtor, within one year before the date of the filing of the petition;
> . . . .
>    (4) the debtor knowingly and fraudulently, in or in connection with the case—
>       (A) made a false oath or account;
> . . . .
>    (c)(1) The . . . United States trustee may object to the granting of a discharge under subsection (a) of this section.

C.     <u>§ 727(a)(2)(A)</u>.

To prevail on a § 727(a)(2)(A) claim, a plaintiff must establish by a preponderance of the evidence that the debtors transferred property in which they had an interest, within a year of the petition date, with the intent to hinder, delay, or defraud a creditor. *In re Brown*, 108 F.3d 1290,

1293 (10th Cir. 1997). Debtors do not dispute that, with respect to the four transferred vehicles, the first three elements are satisfied. They deny, however, any fraudulent intent.

Fraudulent intent is rarely proven by direct evidence. The Uniform Fraudulent Transfer Act ("UFTA") lists 11 badges of fraud:

> (1) the transfer or obligation was to an insider;
> (2) the debtor retained possession or control of the property transferred after the transfer;
> (3) the transfer or obligation was disclosed or concealed;
> (4) before the transfer was made or obligation was incurred, the debtor has been sued or threatened with suit;
> (5) the transfer was of substantially all the debtor's assets;
> (6) the debtor absconded;
> (7) the debtor removed or concealed assets;
> (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
> (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
> (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and
> (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

*See, e.g.*, N.M.S.A. § 56-10-18(B) (New Mexico's version of the UFTA). Courts determining fraudulent intent in § 727(a)(2) proceedings often rely on these or similar "badges of fraud." *See, e.g., In re Curry*, 160 B.R. 813, 818 (Bankr. D. Minn. 1993) (relying on the badges of fraud listed in Minnesota's UFTA); *In re Wreyford*, 505 B.R. 47, 58-59 (Bankr. D.N.M. 2014) (using a similar list of badges); *Ng v. Adler (In re Adler)*, 494 B.R. 43, 65-66 (Bankr. E.D.N.Y. 2013) (same); *United States Trustee v. Sieber (In re Sieber)*, 489 B.R. 531, 545-46 (Bankr. D. Md. 2013) (same); *AB&T Nat'l Bank v. Goodwin (In re Goodwin)*, 488 B.R. 799, 806-07 (Bankr. M.D. Ga. 2013) (same); *see generally* 5 Collier on Bankruptcy ¶ 548.04[1][b][i] (16th ed.) (discussing use of the UFTA badges of fraud in § 548 litigation). "The presence of just one of the above listed factors can warrant a court's conclusion that a transfer was fraudulently made, and, certainly, the presence

of several factors 'can lead inescapably to the conclusion that the debtor possessed the requisite intent.'" *Seiber*, 489 B.R. at 546, quoting *In re Sandoval*, 153 F.3d 722, 1998 WL 497475, at *2 (4th Cir.) (unpublished); *In re Penner*, 107 B.R. 171, 176 (Bankr. N.D. Ind. 1989) (source of the original quote). "Indeed, certain 'badges of fraud' will strongly suggest a purpose to defraud unless some other convincing evidence appears." *Seiber*, 489 B.R. at 546, quoting *Cullinan Associates, Inc. v. Clements*, 205 B.R. 377, 380 (W.D. Va. 1995); *In re Woodfield*, 978 F.2d 516, 518 (9th Cir. 1992)).

The Court analyzes the badges as follows:

| Badge | Discussion |
| --- | --- |
| (1) the transfer or obligation was to an insider; | Debtors transferred the vehicles to their daughters. |
| (2) the debtor retained possession or control of the property transferred after the transfer; | Mr. Candelaria retained possession and control over the 2017 Ram 2500 after the transfer. |
| (3) the transfer or obligation was disclosed or concealed; | The transfers were not disclosed initially, only after prodding from the case trustee. |
| (4) before the transfer was made or obligation was incurred, the debtor has been sued or threatened with suit; | Debtors had been sued by VNB before the transfers were made. The Taylor Road landlord brought suit shortly after the transfers. |
| (5) the transfer was of substantially all the debtor's assets; | The vehicles were Debtors only unencumbered assets that could not be claimed exempt. |
| (6) the debtor absconded; | N/A |
| (7) the debtor removed or concealed assets; | They did not conceal the vehicles but they did conceal the transfers when they filed their bankruptcy schedules. |
| (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; | No value was received. |
| (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; | Debtors were insolvent when the transfers were made. |
| (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and | No. |
| (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor. | No. |

Here, badges 1, 2, 3, 4, 5, 7, 8, and 9 support a finding of fraudulent intent. These badges of fraud, combined with the Court's finding that the Debtors' testimony about the vehicle transfers was totally lacking in credibility, lead the Court to find and conclude that Debtors transferred the vehicles with the intent to hinder, delay, or defraud creditors. The UST proved its § 727(a)(2)(A) claim by a preponderance of the evidence.

D.      § 727(a)(4)(A).

To prevail on a § 727(a)(4)(A) claim, a plaintiff must prove by a preponderance of evidence that debtor made a statement under oath; that the statement was false; that debtor knew the statement was false when he made it; that debtor made the statement with intent to defraud; and that the statement materially related to the debtor's bankruptcy case. *Lobera*, 2014 WL 640980, at *5, citing *McVay v. Perez (In re Perez),* 411 B.R. 386, 401 (D. Colo. 2009). A false oath can be made in written submissions to the Court or under oath at a § 341 meeting, deposition, or trial:

> A debtor's petition, schedules, statement of financial affairs, statements made at a 341 meeting, testimony given at a Federal Rule of Bankruptcy Procedure 2004 examination, and answers to interrogatories all constitute statements under oath for purposes of § 727(a)(4)[(A)]. The same holds true for deposition testimony and testimony at other hearings during the course of the bankruptcy case. The false oath also need not be an affirmative misstatement; knowing and fraudulent omissions will also suffice.

*In re Jayme*, 2018 WL 3218104, at *9 (Bankr. D.N.M.) (citations omitted).

In the context of § 727(a)(4)(A), a distinction is made between reckless disregard for the truth, which is a form of fraudulent intent, and "mere mistake or inadvertence," which is not. *In re Garland*, 417 B.R. 805, 815 (10th Cir. BAP 2009) ("While mere mistake or inadvertence is not sufficient to bar a debtor's discharge under § 727, reckless indifference to the truth has consistently been treated as the functional equivalent of fraud for purposes of § 727(a)(4)(A)"); *In re Cribbs*, 327 B.R. 668, 673 (10th Cir. BAP 2005) ("Intent to deceive may be inferred from . . . a reckless

disregard for the truth."); *In re Peterson*, 2007 WL 2683018, *2 (10th Cir. BAP) ("A debtor will not be denied a discharge if the false statement is due to mere mistake or inadvertence.").

Debtors argue that their omissions and misstatements were borne of mistake, inadvertence, confusion, and stress. The Court cannot agree. Debtors' false oaths pervade every aspect of their bankruptcy case and this adversary proceeding. Debtors lack of credibility is undeniable. At best, Debtors can be said to have acted, in some instances, with a reckless disregard for the truth. In fact, Debtors for the most part deliberately lied under oath on their bankruptcy schedules and SoFA, at their § 341 meetings, in depositions, and a trial. The false statements were made with the intent to deceive their creditors and the Court. Debtors wanted to avoid losing their valuable, non-exempt assets, to pay their creditors nothing, and to obtain the benefit of the bankruptcy discharge.

From the inception of their bankruptcy case, Debtors made affirmative misstatements and knowing and fraudulent omissions. The following is a summary of Debtors' most culpable false oaths.

    1.    <u>False Oaths on Bankruptcy Schedules and SoFA</u>.

        a.    <u>Undisclosed Transfers</u>. On Debtors' original SoFA, filed in December 2018, they affirmatively answered "no" to the question, "within 2 years before you filed for bankruptcy, did you give any gifts with a total value of more than $600 per person?" Similarly, they answered no to the question "[w]ithin two years before you filed for bankruptcy, did you sell, trade, or otherwise transfer any property to anyone other than property transferred in the ordinary course of your business or financial affairs." A few months before answering these questions, Debtors had transferred four vehicles to their daughters. Debtors did not forget about the transfers, misunderstand the SoFA, or give the wrong answer by mistake. They intentionally omitted them. Furthermore, when Debtors finally disclosed the transfers, they testified that three of transferred

vehicles were graduation gifts, which is an obvious fabrication. Even if they were graduation gifts, however, that would not excuse Debtors' failure to disclose the transfers. Further, Debtors' testimony that they transferred the 2017 Ram 2500 for succession purposes is false. Debtors did not disclose the transfer for the same reason that they made it—they wanted to keep their expensive new truck from their creditors.

      b.      <u>Undisclosed Property</u>.

- <u>2017 Utility Trailer</u>. Debtors did not disclose their trailer on schedule A/B. At the initial § 341 meeting, Mr. Candelaria told Ron Holmes that Debtors did not own a trailer. When asked in a deposition why he said that, Mr. Candelaria responded that he thought Safe Site owned the trailer. However, Safe Site's bankruptcy schedules, filed only two days before Debtors' § 341 meeting, did not schedule the trailer.

- <u>F&S Candelaria</u>. F&S Candelaria may have had little or no value on the petition date, but Debtors relied on the LLC to explain and justify the $105,000 in management fees Safe Site paid to Mrs. Candelaria in 2017. It should have been disclosed.

- <u>Johnson & Johnson stock</u>. The stock was not of great value ($1,000, Debtors say) but it should have been disclosed.

- <u>2007 Chrysler Town & Country</u>. Debtors had trouble keeping track of their dozen or so vehicles. It should not have been so difficult. A simple spreadsheet and file folder of vehicle titles would have been sufficient. Apparently when Debtors wanted to transfer a vehicle to their daughters, they had no trouble locating the title and determining who owned the vehicle.

- <u>Hearing Aids</u>. Worth $5,000, the hearing aids should have been on the original schedules.

- Life Insurance Policy. The Primerica policy may be a term policy, but it should have been scheduled. It is an expensive policy ($15,168 in premiums per year).

- Bank Accounts. Debtors opened two New Mexico Bank and Trust accounts five days prepetition. Clearly, they should have been scheduled.

c. Undisclosed Income. On their SoFA, Mrs. Candelaria disclosed 2017 income of $228,000, while Mr. Candelaria disclosed 2017 income of $0. Those disclosures were materially wrong. Mr. Candelaria had income of $29,000 in 2017. Between them, in 2017 Debtors received an additional $225,000 or so in cash from Safe Site, according to Ms. Van Gilst's accounting work, and an additional $23,713.78 in 2018.[13] As Safe Site is a nonmember nonprofit corporation, the cash had to be taxable income to Debtors. Debtors have never amended their SoFA to reflect their actual income in 2017 or 2018.

2. False oaths in § 341 meeting testimony. Debtors knowingly and fraudulently made false oaths at their § 341 meeting by averring to the accuracy of their bankruptcy schedules and by testifying that they did not own a trailer. In their continued § 341 meeting Debtors falsely averred that the cash for the 2017 Ram 2500 came solely from Mrs. Candelaria's salary, omitting the F&S management fees and the other cash taken from the business in 2017. They also averred that they transferred the truck to their daughter as part of their succession plan, and the other vehicles as graduation gifts. They averred that the bonuses they took at the end of 2017 were Ms. Seligman's doing, not theirs. They also averred that they did not take any cash out of Safe Site pre-petition except to pay for Safe Site expenses. They also averred that the down payment on the Liebel Court house was "10 or $15000." All of these averments are false.

---

[13] Ms. Van Gilst's work is partially corroborated by Debtors' responses to the UST's first set of interrogatories, where they admitted that in 2017 and 2018, cumulatively, they received cash withdrawals and/or cashier's checks from Safe Site totaling $152,965.00.

3. <u>False oaths in deposition testimony</u>. During his July 11, 2019 deposition, Mr. Candelaria averred that Debtor had no bank accounts other than the scheduled accounts at U.S. Bank. That was not true. He also averred that the "closet cash" came solely from Mrs. Candelaria's salary, which was not true.

4. <u>False oaths in trial testimony</u>. The false statements made by Debtors during trial are numerous, including:

    a.     <u>Felix Candelaria testimony</u>

- The Jeep, Nissan, and Jaguar transfers to their children were graduation gifts;
- The 2017 management fee checks from Safe Site to Mrs. Candelaria relate to property leased from F&S Candelaria;
- The management fees paid to Mrs. Candelaria were intended to cover utility bills and other Safe Site expenses;
- Ms. Seligman was the one who told Debtors to use cash to pay bills and rent;
- Debtors did not take cash out of Safe Site and keep it in their house. Rather, all of the "closet cash" came from Mrs. Candelaria's paychecks;
- The $20,000 bonuses paid at the end of 2017 were given to Debtors by Ms. Seligman, who told them that they had a good year and deserved a bonus;
- Debtors transferred the 2017 Ram 2500 to their daughter because she was the one most likely to take over the business;
- F&S Candelaria owned the Los Lentes building;
- Ms. Seligman advised Debtors to put the 2017 Ram 2500 in their names;
- The selling dealership advised Debtors to put the 2017 Ram 2500 in Debtors' names.

    b.     <u>Sarah Candelaria testimony</u>

- She started cashing her payroll checks in 2016 because she did not want Ms. Seligman to have access to the money;
- She thought F&S Candelaria and Safe Site were the same thing;
- Ms. Seligman advised Debtors to put money into an F&S Candelaria account to pay Safe Site bills;
- She transferred money to F&S Candelaria so it could pay its note;
- The transfer of the 2017 Ram 2500 to Marissa Candelaria was because she was going to take over the business;
- She does not know why Debtors didn't transfer the other vehicles used for Safe Site to Marissa Candelaria;

- The use of cash to pay bills was Ms. Seligman's idea;
- F&S Candelaria was responsible for paying electric, gas, water, vehicle payments, rent, and other expenses of Safe Site;
- Ms. Seligman advised Mr. Candelaria to write the "management fee" checks to Mrs. Candelaria, and that it was a common practice to pay bills with management fee checks.

Looking at the overall picture, the Court is convinced that Debtors deliberately lied about their income and assets in an effort to conceal what they had been up to with Safe Site (including an apparent tax avoidance scheme), and to keep their unencumbered, nonexempt assets from creditors. Debtors must be held accountable in these proceedings on par with their level of education and business experience. *Stamat v. Neary*, 635 F.3d 974, 982 (7th Cir. 2011) (the debtors' level of education and business experience may inform the court's analysis of their intent when considering whether they acted in reckless disregard for the truth).

Debtors' discharge will be denied on the additional or alternative ground of their numerous knowing and fraudulent false oaths.

## Conclusion

The UST proved by a preponderance of the evidence at trial that Debtors fraudulently transferred property with the intent to defraud creditors and knowingly and fraudulently made false oaths. Debtors' discharge shall be denied in a separate order.

_____
Hon. David T. Thuma
United States Bankruptcy Judge

Entered: January 7, 2022
Copies to: Counsel of record